## Case No. 3,691.

### DAY v. UNION INDIA-RUBBER CO.

[3 Blatchf. 488.] [1]

Circuit Court, S. D. New York.    Aug. Term, 1856. [2]

EXTENSIONS OF PATENTS — RIGHTS OF ASSIGNEES AND LICENSEES—INTERPRETATION OF PATENTS.

1. The cases of Wilson v. Rousseau, 4 How. [45 U. S.] 646, Wilson v. Simpson, 9 How. [50 U. S.] 109, and Bloomer v. McQuewan, 14 How. [55 U. S.] 539, commented on.

2. Various special acts of congress extending patents, commented on, with reference to their provisions in favor of assignees, grantees, and licensees under the original terms of the patents.

3. The language of the 18th section of said act of July 4, 1836, considered. The effect of that section is, to continue to those who were assignees or grantees of the right to use a patented invention during the original term of the patent, the right to use it during an extension of the patent under that section, whether such right arose from the purchase of a machine, or from a direct assignment or grant of a limited or unlimited right to use.

[Cited in Wood v. Michigan Southern & N. I. R. Co., Case No. 17,957; Wetherill v. Passaic Zinc Co., Id. 17,465.]

4. But such right is limited to a right to use, although the person holding it may also have held, during the original term, an exclusive right to use, to make and to vend.

5. And such right is secured only to the extent of the respective interests of the assignees and grantees therein.

6. If, before the extension, the right to use was limited to a single state, county, town, or smaller district, it continues, during the extension, subject to the same limitations; and if the right was to use a specified number of machines, within a particular district, the limit in number and restriction of place continues.

7. If the only right to use was one which resulted from the purchase of a machine, the right to use is co-extensive with the existence of the machine, and expires with it.

8. Under said 18th section, the assignees and grantees of the right to use a patented process, are continued in the right to use it during an extension of the patent, equally with the assignees and grantees of the right to use a patented machine.

9. The case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, commented on.

10. Chaffee's patent of August 31st, 1836, relative to India rubber, covers both the process described in the specification, and the machinery described as that to be used in carrying on the process.

11. Where, at the expiration of the original term of that patent, A. had a right to use the patented invention for the manufacture of certain articles, and continued, during an extension of the patent granted under the 18th section of the act of July 4, 1836 (5 Stat. 124), to use the invention, in the manufacture of those articles, in the manner and to the extent he was entitled to use it at the time the original term expired; held, that A. had the right to continue such use, as against B., the assignee of the patent for the extended term.

12. A. had such right, whether the patent were to be construed as being for a process, and

a machine to be used in such process—or for a process alone—or for a machine alone—and whether the machinery used by A. under the patent was or was not in existence prior to the commencement of the extended term.

13. The case of Wilson v. Turner [Case No. 17,845], cited and approved.

[14. Cited in Holiday v. Mattheson, 24 Fed. 186, to the point that a purchaser acquires the right of unrestricted ownership in the article he buys, as against the vendor.]

In equity. The bill in this case [by Horace H. Day against the Union India-Rubber Company] was founded upon letters patent [No. 16] granted to Edwin M. Chaffee, August 31st, 1836, for "a new and useful improvement in the application of undissolved caoutchouc to cloths, leather, and other articles, in coloring the same without the aid of a solvent, and in the machinery used in the process." The patent was subsequently extended for seven years from the 31st of August, 1850, under the provisions of the 18th section of the patent act of July 4, 1836 (5 Stat. 124). The rights held by the patentee under the extension were assigned to the plaintiff, by an assignment bearing date July 1st, 1853. It appeared, by the evidence, that at the expiration of the original term of the patent, the defendants had a right to use the invention patented, for the manufacture of certain articles which derived their principal value from the use of India rubber prepared and applied to the manufacture of such articles under the patent in question, with others; and that, since the expiration of the original term, and during the extended term, the defendants had continued to use the invention in the manufacture of such articles, in the manner and to the extent they were entitled to use the invention before and at the time the original term expired.

Edwin W. Stoughton, Clarence A. Seward, and Nathaniel Richardson, for plaintiff.

William Curtis Noyes and George C. Goddard, for defendants.

HALL, District Judge. The plaintiff's counsel insisted, upon the argument, that the patent was for a process and not for a machine. Such may, perhaps, be the true construction of the patent. I am inclined to think, however, that the patent covers both the process described in the specification, and the machinery described as that to be used in carrying on the process. It may, without doubt, be properly conceded that the patent is not for the described machinery alone; and that, if the machinery is patented, its use is but auxiliary to the carrying on of the process, which is the primary and most important subject of the patent.

It was further insisted by the plaintiff's counsel that, as the patent was for a process and not for a machine, the defendants, as assignees or grantees "of the right to use the thing patented" during the original term of the patent, had no right to continue such use after the extension of the patent; and that,

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]
[2] [Affirmed in 20 How. (61 U. S.) 216.]

if it had been a patent for a machine only, the plaintiff would still have been entitled to a decree, because the evidence established the fact that the defendants had used, since the extension, a machine which was not in existence at the expiration of the original term.

It is unnecessary, in the view which I have taken of this case, to enter upon an elaborate discussion of these and many other questions which were argued by the counsel for the respective parties, for I shall hold that the defendants have a right, under the provisions of the 18th section of the act of July 4, 1836, to use "the thing patented" by Chaffee, whether the patent be for a process and a machine to be used in such process—or for a process alone—or for a machine alone, and whether the machinery used by the defendants was or was not in existence prior to the renewal of the patent.

My general views in regard to the purposes and intentions of congress in adopting the provisions of this 18th section which relate to the rights of assignees, agree with those which are very clearly stated in the opinion delivered by Mr. Chief Justice Taney in the case of Wilson v. Turner [Case No. 17,845]. As I understand that opinion, it furnishes abundant evidence, that at the time that decision was made, the learned chief justice maintained the position, that by the section above mentioned, the right to use the thing patented was continued to the assignees and grantees of such right for the original term, without regard to the question whether the patent was for a process or a machine, or to the question whether the particular machine used was or was not in existence at the time the original term expired.

I am well aware, that in the well-considered opinions of Mr. Justice Nelson in Wilson v. Rousseau, 4 How. [45 U. S.] 646, of Mr. Justice Wayne in Wilson v. Simpson, 9 How. [50 U. S.] 109, and of Mr. Chief Justice Taney in Bloomer v. McQuewan, 14 How. [55 U. S.] 539, there are many expressions which appear to indicate that those learned judges considered that the right of an assignee or grantee of the right to use the thing patented during the original term, was limited to the use of machines which such assignee or grantee had in operation, or in being, at the time the extended term commenced. But those cases were all decided in favor of the defendants, who claimed under the 18th section before referred to, and the precise question now presented was not necessarily decided in any one of them. Nor am I aware that the supreme court have ever made any decision by which they have judicially declared that the rights of such assignees or grantees must be so limited; or indeed made any decision necessarily inconsistent with the view I have taken of this case.

In the case of Wilson v. Rousseau [supra] the counsel for the respective parties severally maintained extreme positions upon the question of the construction of the section,

and the supreme court considered that there were well-founded objections to the adoption of either. Mr. Justice Nelson, in delivering the opinion of the court, declared that the interpretation of the language of the section which was then urged by the counsel for the defendants, would subvert, at once, the whole object and purpose of the enactment; and that, to adopt the construction of the counsel for the plaintiff, was to make the clause virtually a dead letter. Both of these constructions were, therefore, repudiated, and it was declared that the benefit conferred by the clause in question, was limited "to the naked right to use the thing patented; not an exclusive right even for that, which might denote m ... oly; nor any right at all, much less exclusive, to make and vend."

It is true that Mr. Justice Nelson, after referring to the proceedings and inquiry which are required as preliminary to the renewal of a patent, says: "It is obvious, therefore, that congress had not at all in view protection to assignees." But this remark must be referred to the proceedings and inquiry before mentioned; for the learned judge could not have intended to apply it to the clause now under consideration, which declares, in express terms, that "the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein." Most certainly, the learned judge did not intend to say that this language was not designed for the protection of assignees. And I cannot doubt it was intended to protect them fully against a claim, which might otherwise have been set up under the renewed patent, that they could not continue the use of the thing patented without a new license, grant or assignment for the extended term.

It is also true, that in other parts of Mr. Justice Nelson's opinion, the right of assignees and grantees under the clause in question is said to be the right to use the patented machine or machines in which they were interested at the time of the extension. And such seems to have been the understanding of the learned justice who delivered the opinion of the court in the case of Wilson v. Simpson [supra]. But, in neither of those cases was the question now presented necessarily discussed or determined; and the judges of the circuit courts ought not to hold themselves bound, and the rights of parties concluded, by the language of a judge of the appellate court, however eminent he may be, unless such language was strictly applicable to the case then before the court. If the question now presented had been discussed in behalf of parties in adverse interest, and had been necessarily considered and decided, it would be my duty to follow such decision. But, as this precise question has never been so discussed, or necessarily considered and determined, I feel bound to act upon my own judgment of the rights of the parties—a judg-

ment formed upon deliberate consideration, and in spite of a strong disinclination to adopt a conclusion adverse to the dicta of the learned justices to whose opinions I have referred.

The case of Bloomer v. McQuewan [supra] necessarily decides nothing for or against the present defendants. But it appears to me, that the reasoning of the learned chief justice affords some support to the position which I have determined to take in this suit, especially when considered in connection with the reasoning of Mr. Justice Nelson in Wilson v. Rousseau. In the last mentioned case, one of the reasons given for repudiating the construction contended for by the plaintiff's counsel was, that it would render useless the clause in question, and that there would be no subject matter upon which it could have reasonable operation and effect. And, if I understand the clear and cogent reasoning of the chief justice in Bloomer v. McQuewan, he fully demonstrates that the clause is useless and unnecessary, in respect to machines in existence and operation, under the authority of the patentee, at the time of the expiration of the original term of the patent. If, as is there said, the purchaser of a machine, for the purpose of using it in the ordinary pursuits of life, exercises, in using such machine, no rights created by the act of congress, and does not derive title to it by virtue of the franchise or exclusive privilege granted to the patentee, if the machine is no longer within the limits of the monopoly, and if no special act of congress passed after such purchase could deprive the purchaser of the right to use such machine, because the right had become vested, and entitled to the protection of the 5th amendment to the constitution of the United States, it is certainly difficult to perceive what additional strength or efficiency could be given to the right to use by the clause in question.

If we look to the previous and contemporary legislation of congress, in renewing particular patents by special and private acts, and to the peculiar language of the clause now under consideration, it is, I think, quite clear, that the construction contended for by the plaintiff's counsel ought not to be adopted.

The section under consideration contained the first enactment by virtue of which the power to renew and extend patents was conferred upon the administrative officers of the government. Prior to that enactment, congress had passed no general law authorizing such extension, but had, from time to time, passed special acts extending or renewing particular patents. Several of those acts are now before me, and will be referred to in the order in which they received the approval of the executive.

The act approved January 21, 1808, entitled, "An act for the relief of Oliver Evans" (6 Stat. 70), authorized the issue, in the form prescribed by the general patent act, of letters patent for his invention, discovery and improvements in the art of manufacturing flour and meal, and in the several machines which he had discovered, invented, improved and applied to that purpose. This act, though authorizing the issue of original letters patent, was, in fact, intended to authorize letters patent for inventions which had been before patented, and which prior patent had been adjudged to be void by the circuit court of the United States for the district of Pennsylvania. Evans v. Jordan, 9 Cranch [13 U. S.] 199, 204. Under these circumstances, the act specially provided, that no person who might have theretofore paid Evans for a license to use his improvements, should be obliged to renew the license, or be subject to damages for not renewing the same; and that no person who should have used the improvements, or have erected the same for use, before the issuing of the patent, should be liable for damages therefor. From this it will appear, that the prior licensees were the persons to whom protection was first given by the provisions of the act.

An act approved February 7, 1815 (6 Stat. 147), extended the rights and privileges of the same Oliver Evans, under a patent issued on the 14th of February, 1804, for his improvements on steam-engines. This act contained a provision, that he should not charge or receive, for the privilege of constructing or using his improvements during the extended term, any greater sum than he had hitherto charged for a like privilege, under his patent then in force.

The patent granted to Jethro Wood, for improvements in the construction of the plough, was extended by an act of congress, approved May 19, 1832 (6 Stat. 486). This act contained two provisos—First, that all rights and privileges before sold by the patentee, to make, use, or vend his improvements, should enure to and be enjoyed by the purchasers respectively, as fully, and upon the same condition, for the extended, as for the existing term; and second, that the price at which the same had been usually sold by the patentee, should not be advanced upon future purchasers.

Three several patents granted to James Barron, for certain improvements therein mentioned, were extended by an act of congress, approved July 2, 1836 (6 Stat. 678), but two days before the approval of the act in which the 18th section, before referred to, is found. This act contained a proviso, that all rights and privileges theretofore sold or granted by the patentee, to make, construct, use, or vend the improvements, or either of them, and not forfeited by the purchasers or grantees, should enure to and be employed by such purchasers or grantees respectively, as fully and upon the same conditions, during the extended period, as for the term which existed when such sale or grant was made; and also a proviso, that those who had bona fide erected or constructed any manufacture or machine for

the purpose of putting the improvements, or either of them, in use, after the expiration of the patents so extended, or were then erecting or constructing any manufacture or machine for that purpose, should have the right of using such improvement or improvements so erected or constructed, or then being erected or constructed.

The act approved February 6, 1839 (6 Stat. 748), renewing and extending the patent of Thomas Blanchard, contained similar provisions.

These acts furnish abundant evidence, that congress, in renewing patents, have been quite as careful to protect the rights and interests of assignees and grantees of the right to use the thing patented, which existed independently of the ownership of the machines patented, as to protect the rights and interests of those who merely owned such machines, and had no right to use the thing patented, other than that impliedly granted by the sale of such patented machines.

The 18th section of the act of 1836, when first reported, did not contain the clause now under consideration—perhaps because it was considered that the declaration that the patent should, after the extension, have the same effect, in law, as though it had been originally granted for twenty-one years, would sufficiently protect the rights of assignees. The clause was subsequently inserted in an amendment. I have not been able to find any report of the debate, if any, had upon this amendment; nor have I been able to find any statement of the purpose or intention of the mover in offering the amendment. It will, however, be seen, that the language is different from that previously adopted for similar purposes in the special acts above referred to; that it is more compact and more general in its terms; and that no separate provision is made either for the assignees, grantees, or licensees under the original letters patent, or for those who had purchased or rightfully constructed the patented machine. Whatever provision is made for either of those classes is to be found only in the general language; and, in my judgment, the language used is broad enough to cover, and was intended to cover and protect, the right to use held by both. If it is to be confined to either, the language can be more appropriately applied to the assignees and grantees of the right to use, who have become such by a direct assignment or grant, irrespective of the sale of a machine or machines, than to those whose right rests upon the tacit grant of the right to use the specific machine sold, which results, by implication of law, from the sale of a particular machine by or under the authority of the patentee.

The term "assignee," when applied to the holder of a right to use a patented invention, is certainly suggestive of the idea of one holding under a direct assignment of the right or privilege to use such invention, rather than of a mere owner of a particular machine, who obtained his right under a sale, and not under an assignment. And the use and connection of the terms, "assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein," seem also to convey the impression that something more than the mere ownership of existing machines was intended; and that they were intended to embrace all classes of such assignees and grantees, and all inventions, whether of machines, processes, or compositions of matter, and to embrace rights and interests which were different in extent either of time or territory, or both.

If the owners of machines were the only persons to whom it was intended to extend protection, the language most likely to be adopted to express such an intention, would express that intention clearly, and express no other. And an intention so simple would naturally be expressed in direct and explicit language, the interpretation of which would be obvious and certain. If, however, other and more extended and varied interests were intended to be embraced, more general language would, necessarily, be adopted, or the length of the clause would be increased, by inserting general or special references to the different classes of cases to which it was intended such protection should extend.

The clause immediately succeeding, which provides that "no extension of a patent shall be granted after the expiration of the term for which it was originally issued," was said, in Wilson v. Rousseau, 4 How. [45 U. S.] 646, to strengthen the view, that the clause now under consideration was limited, in its effect and operation, to the persons using the machines at the time of the new grant; and it was said that the object of the provision just quoted, was "obviously to guard against the injustice which might otherwise occur to a person who had gone to the expense of procuring the patented article, or changed his business, upon the faith of using or dealing with it after the monopoly had expired, which would be arrested by the operation of the new grant;" that, "to avoid this consequence, it is provided, that the extension must take place before the expiration of the patent, if at all;" that "it would be somewhat remarkable, if congress should have been thus careful of a class of persons who had merely gone to the expense of providing themselves with the patented article for use, or as a matter of trade, after the monopoly had ceased, and would be disappointed and exposed to loss if it was again renewed, and at the same time had overlooked the class who, in addition to this expense and change of business, had bought the right from the patentee, and were in the use and enjoyment of the machine, or whatever it might be, at the time of the renewal;" and that "those provisions are in juxtaposition, and, we think, are but parts of the same policy, looking to the protection of individual citi-

zens from any special wrong and injustice on account of the operation of the new grant."

Can it be possible that it would not be a part of the same policy to protect assignees and grantees of the right to use, who had paid for such right, changed their business, and made investments, with the view of using the invention, upon the faith of their existing right to continue the use of the patented invention after the patent should expire; and that those who had fairly and properly contributed their full share to the remuneration of the patentee, would be left entirely at his mercy, and completely within his power, from the time his monopoly was renewed, while those who had contributed nothing to such remuneration would be carefully protected against loss? Is it possible that no such protection was intended to be extended whenever the patent was for a process, or when, by fire, or other accident, the machines which the party had a right to use were destroyed just prior to the expiration of the original term? In this connection, it must be observed, that the authority to renew, conferred by the section, extends to patents issued before the passage of the act which contains it; and that the clause inserted for the protection of assignees and grantees was intended to protect, alike and equally, the assignees and grantees of the right to use patented inventions, whether they become such assignees or grantees before or after the passage of such act. If congress was careful to prevent injustice in the cases referred to by the learned justice in Wilson v. Rousseau [supra], it can hardly be supposed that it was less careful of the rights of those who had paid the patentee or his grantee, to his full satisfaction, for the right to use the invention patented during the whole period of his monopoly, and had made investments, and changed their business, in the full confidence that, when the patent should expire, they would be entitled to the unrestrained use of such invention, and would be able, for a considerable period after the expiration of the patent, to avail themselves of the advantages of their previous investments, as well as of their superior skill and greater experience in securing fair profits, notwithstanding the increased competition which the termination of the monopoly would be likely soon to create.

But, it may be said, that the clause under consideration is more important in respect to patents subsequently issued or assigned; that the construction to be put upon it should be mainly determined by considerations connected with the interests of those claiming under such patents or assignments; and that assignees and grantees of the right to use, obtaining their rights after the passage of the act, purchase with reference to this provision, and either pay a less price, because the right purchased expires with the original term of the patent, or pay a higher price, and secure at once the right to use under both the original and extended terms.

While it must be conceded that the injustice produced by the construction sought to be maintained by the plaintiff, is most manifest in respect to persons who had become assignees and grantees of the right to use a patented invention prior to the passage of the act of 1836, I do not perceive that there is any reason for adopting such construction, even as against those who subsequently became such assignees and grantees.

Congress legislates upon the subject of patents under the provision of the constitution which declares that congress shall have power "to promote the progress of science and useful arts, by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." The patent acts have been passed for the promotion of the useful arts, for the ultimate benefit of the public, and not for the sole benefit of inventors and patentees. It is the policy of the government, and the intention of the acts of congress, to promote the progress of the useful arts by offering rewards for useful inventions. These rewards have been hitherto offered in the form of special and exclusive privileges for a limited time. It is for the ultimate benefit of the public that such privileges are granted, allowed to operate, and protected for limited times, for the direct benefit of inventors and their assignees and grantees. But there is another and less remote public object to be attained by the privileges and protection thus afforded. These privileges are granted for the additional purpose of inducing inventors, and their assignees and grantees, to make the required expenditures and investments in order to put the patented inventions in practice, and thereby to give the public the benefits to be derived from a sucessful use of the inventions, at the earliest day, and to the fullest extent, required by the public interests. The value of most inventions is, at first, quite uncertain, and the success of those undertaking to put them in practice is by no means sure. In very few cases can the inventor hold and exercise all the privileges conferred by his patent; and his own and the public interests alike require that he should sell, assign, or grant portions of such privileges to others. If the purchaser of such privileges must necessarily pay an increased price, in order to secure a right to use the invention during an extended term which may never be granted, or incur the risk of being placed at the mercy of the patentee, and subject to such extortionate demands as the cupidity, caprice, or malice of the patentee may suggest, as soon as the original term has expired, the patentee will find fewer persons disposed to purchase, and he will receive, during the original term, less remuneration. The public will, therefore, suffer by the delay in bringing the invention into practical and general use, and by the

greater probability that persons using the invention will be compelled, for an extended term of seven years, to pay tribute to the patentee. As the value and success of patented inventions is thus, at best, exceedingly doubtful and uncertain, making it already sufficiently difficult to find business men and capitalists willing to take the risk of purchasing a right to use an invention, and of making the other investments necessary to put it in practice, courts should not, unnecessarily, interpose additional obstacles in the way of such purchases, or needlessly aid in preventing a patentee from receiving, at the earliest possible period, a full remuneration for his time, ingenuity, and expense bestowed upon his invention, whilst the public is, at the same time, realizing the earliest and greatest benefits from its use under the patent, and securing, without injustice to the patentee, its free use immediately after the original term of the patent has expired.

There is another consideration which should, perhaps, have some weight in determining this question of construction. The renewal or extension is granted only because the patentee has not received a sufficient remuneration for the time, ingenuity and expense bestowed upon his invention. It is for this reason only that he is authorized to make further demands upon the public; and this reason for renewal does not generally exist, unless the just rights of the patentee have been infringed, and his profits under the patent have been expended in the prosecution of suits to establish and maintain his rights. His assignees and grantees, having recognized his rights, and paid the agreed remuneration for the right to use his invention, have already contributed their shares towards his remuneration, and should therefore be permitted to continue the use of the invention after the expiration of the original term of the patent, precisely as though it had not been renewed, instead of being placed on the same footing with those who have resisted and infringed the legal rights of the patentee.

The terms of the clause under consideration are certainly broad and general and appropriate enough to secure the just rights of all who can be regarded as assignees or grantees of the right to use the patented invention, whether under a purchase of a machine, or a direct assignment or grant of a limited or unlimited right to use; and the equities of the case and the policy of the patent laws require, that the clause should be so construed as to give such security. The protection which it affords is limited to those who have a right to use; and, in the construction and operation of the clause, it may well be limited, and, I think, should be limited, to the exercise of that particular right, although the persons holding that right may also have held, during the original term, the exclusive right to use, to make, and to vend. This right to use is protected, con-

tinued and secured, only to the extent of the respective interests of such assignees and grantees therein; and, if the right to use before the extension was limited to a single state, county, town, or smaller district, it continues, under this clause, subject to the same limitations. If the right was to use only one, two, four, six, or any other number of machines, within a particular district, the limit in number and restriction of place still continues. If the only right to use was one which resulted from the purchase and ownership of a machine, the right to use is coextensive with the existence of such machine and necessarily expires with it, for no other right to use has ever been granted or assigned to such owner.

The language of the clause thus clearly including all classes of assignees and grantees of the right to use the thing patented, I can see no reason for adopting a construction which imposes a limitation or restriction not found in, or suggested by, the language used, and which would, in my judgment, be opposed to the general policy of the patent laws, injurious to the public, and manifestly and grossly unjust to the large and meritorious class of persons, who, after making due compensation to the patentee for his ingenuity, time, and expense bestowed upon his invention, according to the extent of the interests purchased, have changed their business, and made investments, at considerable risk, for the purpose of putting such invention in practice. I can see no reason for holding that a statute which declares, that the benefit of the renewal of a patent "shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein," must be construed as though it read, that all the restraints, prohibitions, disabilities, and incapacities thereby created, should extend to such assignees and grantees, and as though it expressly declared, that the only right which should remain to such assignees and grantees, should be one guaranteed by the constitution of the United States, and which, consequently, could not, by any possibility, be divested by an act of congress.

But it is said, that in this case, the patent is for a process, and not for a machine, and that, therefore, the clause in respect to the rights of assignees and grantees does not apply. There is, certainly, nothing in the language used, to indicate that the assignees and grantees of the right to use a patented process are not to be protected, equally with the assignees and grantees of the right to use a patented machine. The use of the term "thing patented," instead of "machine patented," is evidence of an intention to embrace more, by the more general term, than would have been embraced by the more specific and restricted term; and I can see no reason whatever for the distinction now insisted upon, if I am right in my conclusions in regard to the true construction of the clause in question. The language used is the broad-

est and most general that could have been used, to embrace patents of every class, and, in my judgment, the right to use the "thing patented" is equally secured, whether the patent is for a process, a machine, or a manufacture.

In the case of McClurg v. Kingsland, 1 How. [42 U. S.] 202, referred to with approbation (or at least without disapprobation) in Wilson v. Rousseau, the defendants claimed a right to use a patented process, under the 7th section of the act of March 3, 1839 (5 Stat. 354), which declares "that every person or corporation who has, or shall have, purchased or constructed any newly invented machine, manufacture, or composition of matter, prior to the application, by the inventor or discoverer, for a patent, shall be held to possess the right to use and vend to others to be used, the specific machine, manufacture, or composition of matter so made or purchased, without liability therefor to the inventor, or any other person interested in such invention." The supreme court held, that the defendants, who had used the invention before the patent with the inventor's consent, founded upon a sufficient consideration, had a right to continue the use of the invention after the inventor had obtained a patent and assigned it to the plaintiffs. I am unable to see any ground for adopting in this case the construction insisted upon by the plaintiff's counsel—a construction entirely different from that which the ordinary interpretation of the clause in question seems necessarily to require—when the supreme court, in McClurg v. Kingsland (for reasons similar to those which seem to require that the language of congress should be allowed to extend to all the cases within the scope of its language by the ordinary rules of interpretation), construed language much more restrictive and specific, so as to embrace cases which were not embraced by the literal terms of the statute then under construction.

It is impossible not to see that the language of the statute under which the defendants in McClurg v. Kingsland [supra] rested their defence, afforded much stronger grounds for excluding from its operation a mere process, or for holding that the right could not exist independently of the existence of the specific machine with which it was acquired, than can be found in the language used in the 18th section of the act of 1836. There is no indication, in this act of 1836, that any distinction between a patent for a machine and a patent for a process was intended. But, under the act of 1839, upon which the question decided in McClurg v. Kingsland arose, the persons who are to have the continued right to use, notwithstanding the subsequent patent, are those "who have purchased or constructed any newly invented machine, manufacture, or composition of matter;" and the right expressly conferred is only the right to use "the specific machine, manufacture, or composition of matter, so made or purchased." In the same connection, the right to vend to others to be used is given to the same extent (if the literal expressions of the section are to control) as the right to use; and it can hardly be supposed that this right would be extended beyond the specific article so made or purchased. The language of the act of 1839, therefore, affords some grounds for the conclusion, that the right to use, given by that act, must expire with the specific machine, manufacture, or composition of matter which was made or purchased prior to the patent, although the court did not consider such grounds sufficient to justify them in adopting a construction which was opposed to the general policy of the patent laws, and would probably defeat the real intention of the national legislature.

In fine, my conclusion is, that if the question presented in this case had been fully discussed and necessarily considered by the court in the case of Wilson v. Rousseau, the right claimed by the defendants in this suit would have been recognized and established; and that the language which appears to sustain the doctrines insisted upon by the plaintiff's counsel, then and since used by the justices of that court, has been so used, without the learned justices who used the same having considered the class of cases to which the case now under consideration belongs.

If I am right in these conclusions, the bill in this cause must necessarily be dismissed. If the defendants have the right to use, the plaintiff cannot restrain that use by injunction, or have a decree against the defendants for the profits of such use. If the machine used was one which its previous owner had a right to use only in other territory, and had no right to sell, it can make no difference; for this suit respects only the right to use. Even if the defendants have constructed a new machine without right, and in violation of the renewed monopoly to make and vend, the plaintiff must bring his action at law for damages, instead of his bill in equity for an injunction, and an account for use and profits.

The plaintiff's bill must be dismissed, with costs.

This case was taken, by appeal, to the supreme court of the United States, where it is reported as Day v. Union India-Rubber Co., 20 How. [61 U. S.] 216. The decree of the court below was affirmed, but the supreme court did not pass upon any of the questions discussed in this opinion.

[NOTE. For other cases involving this patent, see Day v. New England Car Co., Case No. 3,686; Day v. New England Car-Spring Co., Id. 3,687; Day v. Candee, Id. 3,676; Day v. Union India-Rubber Co., 20 How. (61 U. S.) 216; Day v. Boston Belting Co., Case No. 3,674; Day v. Hartshorn, Id. 3,683; Hartshorn v. Day, 19 How. (60 U. S.) 211; Chaffee v. Boston Belting Co., 22 How. (63 U. S.) 217.]

---

DAY (UNITED STATES v.). See Case No. 14,934.